May it please the court. My name is Beth Kearney and I represent Petitioner Nyra Ghazaryan and we believe that there are three reasons why this court should reverse the immigration judge's decision which was affirmed by the Board of Immigration Appeals denying Ms. Ghazaryan's claim for asylum. The first of these three reasons is the immigration judge failed to make and express adverse credibility finding and the importance of that I will highlight further. Second the immigration judge applied an incorrect legal standard when determining whether Ms. Ghazaryan's conduct was culpable to the extent that it could be deemed assistance in persecution. Finally the immigration judge improperly shifted the burden of proof to Ms. Ghazaryan before any evidence indicated that she assisted in persecution. Counsel let me ask you about what was puzzling me in this case. The IJ determined basically that she did not bear her burden of proof to show that she did not assist in persecuting somebody else on a protected ground. She was working as a guard in a prison where they had political prisoners and she conceded that she had walked at least one prisoner down to a location to be beaten or tortured, I forget which, but political prisoner. Now as far as I could tell from the record the only threat was she would lose her job. I would think if it bothered her to participate in torturing people on account of their political opinion she'd be delighted to lose her job, go back to being a secretary like she was before she was a in torture. So why isn't the IJ right to say she didn't bear a burden of proving that she didn't participate in that persecution and what was there to coerce her into doing that? Well your honor I believe that Ms. Ghazaryan did not knowingly or actively and personally involve herself in the assistance of persecution. She testified that when she escorted the political prisoner to the isolator she did not know beforehand what was going to happen to that prisoner. But you did know that they did beat people in this location? Yes your honor but I think it's... You knew that there were political prisoners? That there were two political prisoners. You knew that as in any prison enforcing discipline even if the reason why they were being escorted to the isolator and possibly beaten was in order to enforce discipline that's part of keeping them in prison which itself would be persecution. Well first of all I think for it to be persecution the beating had to be on account of a protected ground. Well let's back up a minute. Why isn't simply helping to keep people in prison for their political beliefs a sufficient ground to finance who she was being participating in persecution? If you look at precedents that are cited by this court such as those involved in concentration camps and they specifically state that there must be more than just working at those to be persecution. Now I understand that but if the flip side of this is that if somebody is as I understand it kept in prison simply kept in prison for a substantial period of time for their political beliefs and then comes here and claims asylum we are likely to find that to be persecuted that they were persecuted for their political beliefs. Therefore if she took flip it back if she is a prison guard who is simply helping to keep people in prison she's a guard she's not simply somebody she's not a secretary or the hair cutter in Fedorenko she's a guard who is who's there to see that these people do not escape and stay in prison. Why isn't that simply enough right there? Because I don't think that is enough to constitute active personal involvement in persecution. She must you must look at her conduct over a period of time and assess what she did as an individual prison guard. She did not personally be any prisoner. I'm leaving let's leave the being out of it for now. She kept them in prison. That was her job was to see that they stayed there in prison. But there there were two political prisoners there there's no evidence that they weren't there for other reasons other than protesting the government. I thought that's what we meant when she said there were political prisoners I thought that's what she was saying they were there because they were protesting the government. Well even if that's the case unlike a situation of Fedorenko the prison wasn't there just to persecute political prisoners. Her job was to was to enforce discipline and to guard all of the other prisoners that were there and if there were two political prisoners there there were also upwards of 300 prisoners there who weren't and her job was not to persecute any prisoner it was just to keep the yourself or hand them over to somebody bigger and stronger to beat them. Well I don't think she knew that she was handing them over to someone bigger and stronger. I think she admitted that she knew what was going on there at least what they call them isolation room? The isolation building. She admitted that she knew several months into working there that there were prisoners beaten there. She knew that one woman had been killed she knew they came back and I think one of them had to lay in bed for three days couldn't get up. But she did not know when she escorted these women to this place that that was happening to them. Well she in any particular woman she might say I don't know what's gonna happen to you in there but she knew what had happened to the others who'd gone in there. I think just her knowing is not enough to show that she assisted in persecution and I also think that. That seems difficult to me in the sense that her job was an essential part she was not a bystander and what she was participating in was bringing people to a place guarding them so they didn't run away that's what she was doing. And she was bringing them to this location so she was not an incidental person she was necessary to the whole process. But if you evaluate her conduct over the whole the fact that she refused to be prisoners that she herself was beaten, threatened, raped, and eventually forced to flee her country. That's the interesting and disturbing part of the case but the statute doesn't seem to admit of that. Where do we get an exception in the statute? I don't think there is an exception I think the statute and not the statute itself but the cases require that you look at her conduct and everything she did both the Hernandez versus Reno which is an Eighth Circuit case. Hernandez seems to say something like that but it's hard to square with Federico and with our own case law even though one sort of feels that ought to be the case it doesn't seem to be there in the statute. Well if you look at the Ninth Circuit's own case law and for instance the Phoenix they say active personal involvement is necessary and mere membership in the persecutory group such as this prison as to the question you were asking earlier is not enough. That doesn't deal with the mitigation point which is really the interesting one. Why does it mitigate that she herself was eventually treated brutally? You hang around with brutes they may turn on you. Because it shows that she did not share the motives of the persecutors and that she was not a meaningful member of this group that she did everything she could to end the persecution that was happening there and she herself was persecuted for that. Well she didn't do everything she could. I can't see where she did anything. She threatened to go to the press but she did not go to the press. She did not quit her job. I can't see where she did a thing except talk about what she was going to do that she didn't do. She went to her supervisor when that did not work she went to the chief of prisons. She tried to go to the press and the chief of prisons prevented them from speaking to her and then she was beaten in her home and so I think it's understandable that she after that decided that it was not in her best interest to voice her opinion of this anymore and then she eventually had to flee the country. So she didn't go to the press? The press came to her and she was not allowed to speak to them. In essence Miss Gazarian was persecuted for the very thing that she is being said here to have perpetrated. Not for any old reason and I think if you look at the case law and you evaluate her conduct individually and on a continuum and you look at everything she did then it you know supports a finding. The big difference between if we were to think that the Hernandez case had some generative impact there essentially the person was captured made to do what he was doing physically and escaped almost immediately. She was there for how long in this prison? Two years. Before she did anything? I don't think she was there for two years before she did what was going on and immediately tried to try to begin doing something and stayed there to see if she could help the prisoners. What did she do? I mean as Judge Kleinfeld suggested to me she did do something eventually but it was only at the end. Before that she was upset but other than that what did she do? Well I think in the beginning she refused to beat the prisoners. Right. She also complained to the fellow officers and when she was told to be quiet when a more severe incident occurred and one of the prisoners was quiet because she didn't want to lose her job. And I think she was fearful for herself because she was threatened. She was told that if you make a scandal about anything I'll cut your throat. When was that? How long after she got there? That was in I believe six or seven maybe seven or eight months in the summer of 99. I thought what happened was she claimed to be slow on the uptake about what was happening to the prisoners and then when she expressed her unhappiness with it she was told she should shut up or she'll lose her job. So she shut up in order to keep her job and it was long afterward where she started threatening to go above people's heads and go to the press that she got threats to her safety as opposed to her job. That is true. The serious threats to her safety began when one of the prisoners was killed and then they made it look like it was a suicide. If I have a job doing something criminal and somebody says you better shut up about it or you're going to get fired. I would think my reaction would be you can't fire me. I quit. Where is the evidence that before July of 2000 she was threatened? Physically threatened? What I see was that in the fall of 99 this woman was lying in her beds for three days. Did you report these things to anyone? No I did not share this information to anyone. Why? Because I did not have enough power to go against me. That was in her testimony in front of the asylum officer. The asylum officer? Is that what you're referring to? And I think she made some clarifications in her testimony in front of the immigration judge and expressed that she told fellow officers in July I think of 99 about what happened to a specific prisoner who was beaten because she refused to work. That is on page 57 of the record. And he said if you want to work here you better shut up and keep silent. He didn't say anything about hurting her. I don't, the fact that she kept her job for a specific amount of time and didn't automatically quit when this began happening I don't think that goes towards whether she was an assistant, an assister in persecution. There are many cases such as Fedorenko and Lapinex and you know. The charming young lady recruits the person with the wrong political opinion, brings them to the apartment of the ideological killer and knocks on the door, delivers them and leaves. If I understand your argument right, the charming young woman would not be a persecutor? The charming young woman would not be a persecutor if she did not know what her actions were doing. If she did not know that she was taking people based on their political opinions to be killed. Here, Ms. Gazarian did not know when she escorted these prisoners what was going to happen to them and moreover there's no evidence of even a single instance where someone was beaten because of their political beliefs. And even though it's completely reprehensible, they have to have been persecuted. Persecution is only on account of a protected ground. And there's not evidence here that that ever occurred. You mean that if somebody is kept in prison because of their political beliefs and then they do something that is against the discipline of the prison and are beaten, that that is not connected to their political beliefs when they wouldn't even be in prison to begin with if it wasn't for their political beliefs? Yes. Because in this case, you know, there was testimony that they were beaten because of their failure to follow orders. And if you look at the precedent... But why do they have to follow orders? The only reason they have to follow orders is because of their political beliefs. If you look at, for instance, Vyborowicz, it's a similar situation where there is a member of the Latvian political police whose purpose is to round up communists and communist sympathizers and Jewish people on behalf of the Nazi party to investigate them to see what their sympathies are and eventually put them in what the petitioner in that case called a terminal prison. He investigated people on these grounds and admitted to slapping them. And that was found not to be persecution because there was no evidence that he slapped them because of their political beliefs, even though most of the expert testimony in that case indicated that most of the people who were investigated were investigated because of their communist sympathies. Well, we've gone way over. Unless my colleagues have more questions, I suppose we should bring to an end. Thank you, counsel. Thank you. Good afternoon, your honors. My name is Carol Federighi. I represent the respondent, Attorney General Alberto Gonzalez, in this matter. I agree with the sympathies that your honors have expressed. I'll just review the evidence. Ms. Gazarian admitted in this case that she escorted prisoners many times to the isolator unit. As early as June or July of 1999, she knew that prisoners were sometimes beaten in the isolator unit. She found out after the fact that some of the prisoners she had escorted there had been beaten, and she noticed that they had been beaten. She knew of two political prisoners in the prison, and she knew that one of them had been beaten, even if she had receded from her claim that she had actually escorted that prisoner to be beaten. Did she concede that subsequent to June 1999, when she admits knowing that when they were brought to the isolator unit, they were beaten, that she brought a political prisoner to the isolator unit? At the testimony, the hearing, I don't think she said that she ever brought a political prisoner to the isolator unit. She did say that when she talked to the asylum officer, and I'm not sure the time frame that she... I think that was in the fall of 1999, when... well, that was her testimony before the asylum officer, was that in the fall of 1999, she did take a political prisoner to a beating. As I said, she somewhat receded from that at the hearing. I thought she receded to say that she didn't know she was going to be beaten, but she didn't recede, that she took her there. That could be possible. I don't know that exact claim. Maybe... let's see... That was the way I remembered it, too. Kind of like not knowing there's cocaine in those packages in a secret compartment in the trunk. Excuse me? Never mind. Let's see. Looking at page 65 of the administrative record. That's when she saw the prisoner lying down, unable to move. That was the political prisoner. That was in the fall of 1999. I don't know if she said at the hearing that she escorted political prisoners to the isolated units. Would the government take the position that a prison guard in a prison that has political prisoners in it is ipso facto a persecutor? I don't know if we would take that position. That would be a case that... I'd want to see what the board said about that first. That would be the government's position and not what I say here. In this case, there was the additional factor, in addition to her guarding political prisoners and keeping them in prison, which I do agree is problematic. But I'm not willing to say what the government's position on that would be. But here we did have the aggregating factor that she knew political prisoners were being beaten. And she, at least at one point, said that she had escorted a political prisoner to be beaten in the isolated unit. So she didn't know... She escorted a person to be beaten, but she took the position that she didn't know that was going to happen. She took the position that in any individual instance, she did not have any prior knowledge of why that individual was going to the isolated unit. However, I don't think she can hide behind her willful failure to ask what was going on with any particular prisoner. She knew that there was a substantial likelihood that prisoners she was taking to the isolated unit would be beaten. There's something in the record about other uses of the isolated unit. That's true. She claimed there were other uses and that she often took the prisoners there and saw there was an investigator to meet with them or relatives to meet with them. But that wasn't always the case, that they were sometimes beaten. She testified, and this is on page 67 of the administrative record, that she did find out after the event that prisoners that she had actually escorted to the isolated unit had been beaten. And she noticed that they had been beaten. What about the Lapinex case, which does seem to require some direct one-on-one connection between something she did and the persecution of a political prisoner? Likelihoods don't seem to suffice, as I understand it. I think the difficulty in analogizing Lapinex to this case is that in that case, it wasn't clear that any of the people that he started investigations about were being investigated for or eventually persecuted for their political opinion as opposed to their involvement in acts to overthrow the government or to otherwise hurt the Latvian war effort or whatever. So there was criminal prosecution going on sort of parallel with political kinds of things. And they said there was no evidence of any single instance where one of Lapinex's cases actually was a political opinion case as opposed to just a criminal case. That's how I read that. In this case, she admitted that there were political prisoners in the prison and that she was involved in guarding. And as I said, at one point she did say she escorted one to be beaten. And she certainly admitted even later that she did see one had been beaten. Just because she knew of two political prisoners doesn't mean that there weren't others there that she wasn't aware of that were also being beaten. She asked all the guards should quit when there are two political prisoners out of 300. That are being beaten, yes. I think their conscience would require them to quit. It's a voluntary position. She obviously had another job at one point. No evidence she couldn't have gotten another job. Do you need to go that far? I would think there would be lots of personnel there that don't directly escort somebody down the hall to the isolation unit. Yeah, that's true too. Like they said in the Fedorenko case, someone who cuts the hair of prisoners wouldn't necessarily be found to have assisted persecution. So certainly there would be other jobs at the prison. It would again depend on the factual situations of each particular position and the functions or the acts carried out by the person in that. There was some discussion in the record about whether she redeemed herself. Could you focus on that? By complaining about the treatment of the prisoners? Is that what you mean? She did originally when she first found out about the beating. She claimed that she went to her supervisor and said, you know, what's going on here? And he told her to shut up. She would lose her job. And as your honor pointed out, that's not a coercive threat. I mean obviously if she's having trouble with a job, she should quit. So being fired isn't really forcing her to continue on with the persecutory acts in a coercive manner. Then she didn't do anything until the alleged, the fake suicide in July 2000 when she then went to her supervisor or to the prison head and complained. And that's when she claimed she was assaulted and beaten and raped by that individual. She does say now that between June of 1999 and the middle of 2000 that she was trying to help out the prisoners by being their advocate or getting them to assert their rights. But there's no evidence that even by her own account that she did anything more than talk to them. Because she said, well, they didn't want to cooperate. They didn't want to stick their necks out. I'm going to change the subject for a minute. I'd like to take it from the fact that you haven't raised a jurisdictional issue that you're not standing on your jurisdiction. Yes, we've decided not to advance that argument in this case. Yes. So... It would be helpful if you say that, you know, sitting there in front of your brief. Excuse me? It would have been helpful just to say that up front. Okay. You're wondering what's happening to what's happening. Okay, well, I thought since your honors had focused on the other issues, I'd get right into those and then maybe mention that at the end. But, yes, we're not advancing that argument. So basically she didn't... You're waiving the jurisdictional objection. Yes. Yes. They... So the most she did was sort of try and agitate with the prisoners to get them to act. But they did nothing. And a whole year went by. So we're not talking... So even the limited efforts that she did were ineffective. Meanwhile, she continued to escort prisoners to the isolated unit where she knew that on some occasions, at least, they were being beaten. So I don't think that... Has the BIA ever recognized a redemption or a mitigation part to this law? I don't think so because I think in Hernandez, they... I don't know. I didn't look up the board cases. If the board had recognized mitigation, we wouldn't have appealed it into the court. So the only cases that made it into the court were like Hernandez where the court found there was no redeeming or mitigating factors. And the court held that there was. In this case, unlike in that case, there was... Well, in Hernandez, he was coerced into or basically kidnapped and forced to join the guerrilla movement. He was only there for a brief period of time and then he fled as soon as he could, you know, at fear for his life. Here she was involved in the prison and escorting people to this isolated unit for two years. As your Honor has pointed out, it was a job that she was being paid for. She could have quit or leave at any time. No one was forcing her to be there. She was being rewarded financially for the work she was doing. And she continued to escort prisoners even after she knew that some of them were being beaten at the places she was escorting them to. And she waited for almost a year between the time that she knew about these beatings until the time she raised them to the prison chief. And though she does say, as I said, that she made some sort of efforts to get the prisoners to do something about it, those went nowhere. And there's no evidence, I mean, there's no explanation for why it would have taken her a year to realize that wasn't going anywhere. I just want to also point out to the court, though we didn't raise this in our brief, but that the petitioner did not raise... Oh, excuse me, I didn't realize I'm over my time. Thank you, Counsel. Counsel, in not raising a jurisdictional issue, can I assume your position is that if a person is being tortured, if the court were to find that she's eligible for asylum, then the outcome of that is to remand for an exercise of discretion? Yes, Your Honor, I think if the I.J. did find that she had been persecuted, which I think they did, then it would be the next... you'd have to remand for the A.G. to exercise his discretion. If the I.J. didn't reach that issue, and I'd have to look back... I'd have to go back to that determination. Thank you, Your Honor. Kazarian v. Ashcroft is submitted.
judges: Canby, Kleinfeld, Berzon